[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Prom a time long ago, colleges and universities located within CT Page 10122 municipal environs have found it occasionally difficult to peacefully co-exist with the local citizenry. This is in no doubt due to the fact that the college population remains forever young while the local citizenry experiences the inevitable aging process. What passes for spirited fun, pranks and games to the undergraduate often serves as a grievous annoyance for the surrounding adult community. Therefore, in order to peacefully co-exist, both colleges and the cities or towns in which they are located have been forced to major or at least minor in a subject not taught in college but, nevertheless, known far and wide as "town and gown relations."
The present problem facing the court is to attempt to balance the needs of the student body at Fairfield University to participate fully in, extra-curricular sports activities against the absolute rights of the plaintiffs to the full use and enjoyment of their homes and property. It is clear to the court that at present the activities at University Field result in substantial interference with the plaintiffs' use and enjoyment of their homes and property. Therefore, it is incumbent upon the court to devise a solution which will continue to recognize the rights of students to enjoy both intramural and varsity sports and at the same time insulate the plaintiffs from any further assault on their peace of minds and property rights.
In the present case, the plaintiffs consist of four families owning private homes on College Park Drive in Fairfield, Connecticut. The properties of the plaintiffs Charles and Janet Rhudy, Joseph and Kathleen Schena and Paul and Judith Mayer are immediately adjacent to and abutting the campus of Fairfield University and, more particularly, an athletic facility now known as University Field. Plaintiffs Stephen and Robin Rodgers' home is directly across College Park Drive from the properties of the other plaintiffs.
This matter is before the court upon the verified complaint of the plaintiffs and specifically the application for a temporary injunction therein dated November 2, 1999. Multiple hearings have been held in order to accommodate a large number of witnesses including the plaintiffs Charles Rhudy, Judith Meyer, Robin Rodgers and Joseph Schena as well as representatives of Fairfield University including its Director of Athletics Eugene Doris and Douglas Whiting, Associate Vice President for Public Relations as well as lighting experts and sound, noise or acoustical experts. In addition, the court, at the request of and in the company of the parties, made a site visit to the Fairfield campus and homes of the plaintiffs during a varsity lacross game between Fairfield and Ohio State University at University Field. This particular contest took place in the afternoon. Thus, the court did not observe the field lights in operation which, along with the noise emanating from University CT Page 10123 Field during games, has been a source of concern and annoyance to the plaintiffs.
What impressed the court most at this visit was the extremely close proximity of University Field to the properties of the plaintiffs. The evidence disclosed that prior to 1998 University Field was an unimproved grass field with marginal lighting on several telephone poles and was used primarily for practice for intramural teams including football as well as intramural games and, on occasion, varsity team practices.
It is uncontroverted that prior to the summer of 1998, the field had no public address system, no bleachers, no scoreboard, press box or goal posts. In addition, a dense buffer of trees and shrubs existed between the field and the plaintiffs' properties. All plaintiffs were unanimous in their assertions that the uses made and activities conducted on the field prior to the summer of 1998 never interfered with the plaintiffs' use and enjoyment of their properties. With respect to the use of the field prior to 1998, the plaintiffs were consistent in describing such use as being limited to practice for various sports and intramural games. Fairfield has alleged that junior varsity football games and games of Fairfield Prep's junior varsity teams also used the field prior to 1998. (Plaintiffs' exhibit H, letter to Charles S. Rhudy from Doug Whiting 8/31/99.) On May 18, 1998, Fairfield filed an application for Certificate of Zoning Compliance with the Fairfield Zoning office wherein it described its proposed construction and/or use as "Astro-turf: grading to install Astroturf on practice field. . . . (Emphasis added.) In addition, plaintiffs' exhibit II, a brochure entitled "Summer 2000" prepared for Fairfield University, the last page of which contains a schematic map locating buildings and playing fields on the campus, identifies the present "University Field" as Intramural Field." (Emphasis added.)
Also, the zoning application identified lighting changes which were to be constructed consisting of "8 lighting poles, 40' maximum hight, to replace existing pole lights" as well as clearance to construct an "accessory structure 16' x 30' press box." Zoning compliance was approved for all the changes requested. The court observes, however, that both the application to and the approval by the Fairfield zoning office are silent as to the uses or changes to be made in the uses of the field.
That "intramural" or "University Field" has been the scene of markedly increased activity from the time of the completion of the above described changes in 1998 to the present is unmistakenly evident. It is now the locus of intercollegiate games played by the varsity field hockey team, varsity men's lacross team, varsity women's lacross team, as well as the varsity soccer and varsity football teams in adverse weather.[1] (See CT Page 10124 plaintiffs' exhibit H.) What is evident, also, is that intercollegiate varsity competition draws many more fans (spectators) to the field than were present for practices or intramural contests. This was no doubt anticipated by the University which included the construction of a bleacher sitting up to 500 spectators in its renovation of 1998.
University Field is located 71 feet from the plaintiffs' property line (except for the Rodgers who live across the street). The present public address system, having no limiting devise as to sound level, can vary as to decibel level depending upon volume setting (a control on unit) and whether the voice is male or female. Thus, following the 1998 renovations, and due to the close proximity of the field to plaintiffs' properties, the plaintiffs have been forced to endure noise emanating from the public address system at a level enabling the plaintiffs, in their homes with the windows closed, to identify the players on each team, substitutions when made, and the names of those players who have scored or assisted on goals.
Along with noise emanating from the public address system, the plaintiffs complain of a barrage of whistles, air horn blasts and student cheering during both practice and games. Allan Smarden, plaintiffs' sound expert, testified that a sound recording made by him at the field revealed 43 whistle sounds during a time span of six minutes and that during the entire recording of 40 minutes there were 175 whistle sounds recorded. Smarden testified further that approximately 50 percent of the whistles were "impulse noises." An impulse noise is a periodic function (like a hand clap) that has a rapid peak and a rapid fall rate, lasting one second or less. Smarden expressed the opinion that impulse noises are judged to be more "annoying" than a steady noise because of their sharp and startling effect, even when the impulse noise is expected.
These whistles, air horns and crowd reactions are all audible to the plaintiffs within their homes with the windows shut. According to Mr. Rhudy: "I and my family are continually assaulted . . . at all hours of the day and night virtually . . . by noise, public address system, screaming students, cheering crowds, by foul language that can be heard audibly within my house. This goes on all seasons of the year, twelve months a year, every day virtually of the year. I can't live in my house . . . I can't work in my yard. The normal use of my house has been denied to me."
According to Mrs. Rodgers: "It's turned on its head, my idea of what home is supposed to be like. . . . I no longer work as I did. I don't have any place to escape to. I don't have any place to run. . . . I am at home. And for me that is my refuge, my sanctuary . . . I need to raise these kids because my husband is not around a good chunk of the time. So CT Page 10125 I need a place for some peace. And instead of peace . . . all of a sudden we're bombarded by this noise . . . these air horns, these whistles, P.A. system, this crowd noise."
And Mr. Rhudy adds: "I have a feeling that I've never experienced before and that is a desire . . . a happiness when I leave my house. . . . I never experienced that before, a desire to get away. And I get nervous and agitated thinking when I'm going to return, a little while before I'm going to return . . . and I don't know what I'm going to find when I get back. I kind of don't want to return."
The other plaintiffs have similar complaints with respect to the effect that the noise has on their use and enjoyment of their homes. Even the Rodgers who live across the street can hear whistles, cheers and the public address system clearly with the windows and doors all closed. Eugene Doris testified that University Field is in use during the months of August, September, October, November, December (first two weeks only) January (first week only), February, March, April, May and June. In addition, this use of the field occurs approximately 130 nights per year during the aforesaid eleven month period. Thus, one can readily see that respites from sports generated noise are few and far between for the residents of College Park Drive.
The evidence discloses that along with excessive noise the plaintiffs are confronted with the lighting of University Field which is intrusive with respect to their use and enjoyment of their homes. This lighting consists of eight light towers, four on each side of the field, with clusters of floodlights. Each floodlight is a 1500 watt metal halide lamp which, according to Robert J. DeMarini, a lighting expert, is "the biggest lamp source, metal halide that is available in the market place." (Mr. DeMarini's expertise was stipulated to by Fairfield University.) The plaintiffs' homes are situated along one sideline of the field throughout its entire length. The lights on the far side of the field are the lights that shine on and illuminate the plaintiffs' properties. DeMarini conducted lighting measurements to determine the amount of light present on plaintiffs' properties and the source of said light. These measurements were made during a moon-less night with the only natural light source being the stars. He took two measurements, one with the artificial light sources on and one without the field lights. With the lights on, DeMarini concluded that the light present at the doorway off the rear deck of the Meyer residence was 27 times brighter than the light produced by a full moon and the light shining into the upstairs study of this home was 30 times brighter than a full moon.
At the Rhudy residence, DeMarini found that a clear line of sight from the lighting to the second floor existed and measured the light intensity CT Page 10126 to be 135 times the light of a full moon at a point ten feet from the Rhudy property line. According to DeMarini, metal halide lights produce a very white light and, against a dark sky, "you have a strong visual input to your eye which is uncomfortable to it. It can't look at it. It's just like trying to look into . . . sunlight or something of that nature. . . ." This direct line of sight exists to the Meyer's deck and to the upper stories of the Meyer, Schena and Rhudy homes. Rhudy testified: "As we move about the house in the evening hours, there is no escape from that light. It comes through every window, first floor and second floor. . . . It changed my sleeping patterns. . . . Looks like a prison camp out back. Whenever I look out my back door all I can see are those huge searchlights." Mr. Rhudy testified further that "with all the lights on in my home, I can read the entire copy of the `New York Times', illuminated only by the light from Fairfield University." He added that "the lights are not only lit at night but also on overcast days from 9:00 a.m. and are on for hours during the day.
Mr. Schena testified, "Our master bedroom faces the back and it [lights] shine right through the windows where I can sit on my bed and read the newspaper without any lights on. . . . I really can't sit at my kitchen table and face the backyard and have dinner because the lights are right in my eyes to the point where it causes such a strain and aggravation you can't enjoy dinner."
Ms. Meyer testified, "You cannot sit on my deck . . . without feeling you are in the middle of a concentration camp . . . there's no escaping it. . . . You go into the family room, you sit on the sofa, it follows you there."
The court was particularly impressed with a photograph (plaintiff's exhibit R) of the rear of the Meyer home at night. The rear of the house is illuminated as though a team of searchlights are pointed directly at it. When home at night, in all seasons, during activity at University Field the plaintiffs must be confined in their homes with doors closed and shades drawn.
The court notes that including University Field there are five sports fields, excluding baseball fields, on the Fairfield campus. These are "Playing Field" located close to and south of University Field, "Alumni Field" located north of University Field, "Grauert Field" located on the North Benson Road side of the campus, "Barlow Field" located just within the campus boundary at the intersection of Barlow Road and Round Hill Road, and "Varsity Field" located adjacent to and east of University Field. According to Eugene Doris, Fairlfield Athletic Director, Barlow Field, Varsity Field, Grauert Field and Alumni Field are all full-sized fields and all of the sporting events now played on University Field CT Page 10127 could be played on any of these other fields. In addition, Alumni Field has lights, a public address system, bleachers for 4,000 and a scoreboard and, lacking only astroturf, is located far enough away from residential homes bordering the campus so as not to constitute a source of disturbance to the residents.
Based upon the overwhelming evidence indicating the intrusive nature of the activities conducted on University Field on the plaintiffs, residents of College Park Drive, and the infringement of their right to the full use and enjoyment of their homes and properties, the court is convinced that injunctive relief should issue. The court recognizes, also, that the rights of students to engage in intramural and varsity sporting activities on university campus should not be unreasonably and unnecessarily abridged. Nevertheless, the court finds that compelling circumstances exist that require that the plaintiffs be protected from further interference with their property rights.
The plaintiffs' verified complaint and application for a temporary injunction, having come before the court pursuant to an order to show cause why a temporary injunction should not issue as prayed for, the parties appeared and were fully heard, and it appears to the court that a temporary injunction ought to issue without bond.
Therefore, by authority of the state of Connecticut to command and enjoin you Fairfield University and each of your officers, agents and employees, as set forth herein until further order of the court:
1. Present lighting system:
 (a) All existing lights at University Field shall be turned off no later than 7:00 p.m. Monday through Friday and shall be turned off no later than 5:00 p.m. on Saturday, Sunday and/or any legal holiday.
 (b) The university shall not utilize any lights facing towards the properties of the plaintiffs during intramural practice or game competitions, and the university shall eliminate all lights facing towards the plaintiffs' properties within sixty (60) days of this order.
2. Public Address System:
(a) Within sixty (60) days of this order the existing public address system shall be replaced by a CT Page 10128 system utilizing speakers pointed away from College Park Drive and designed with narrow dispersion characteristics and said system shall utilize a compressor/limiter with a governor which shall limit sound emanating therefrom so as not to exceed 50 dBA at the property lines of the plaintiffs. In the event that the new sound system is not installed and operational within sixty (60) days of the date hereof, Fairfield University will refrain from any use of the present sound system and no sound system will be used at University Field at any events, intramural or varsity, practice or games, until the new sound system is installed.
 (b) The existing sound system will not be used for "play by play" purposes but only used for the purposes of player introduction and announcement of scoring during a game.
 (c) The existing sound system will not be used at any time during intramural practice or competition and will not be used during junior varsity or varsity practice.
3. Airhorns: The use of airhorns at University Field is prohibited until further order of this court.
4. Noise: Noise from all sources from activity at University Field including whistles, players and fans, during both games and practices, and at all other times, shall not exceed 50 dBA at the property lines of the plaintiffs.
5. Hours of Operation: University Field shall not be used for any purpose, including maintenance, before 8:00 a.m. or after 8:30 p.m. Monday through Friday; before 9:00 a.m. or after 6:00 p.m. on Saturday; and before 10:00 a.m. or after 6:00 p.m. on Sunday and/or legal holidays.
6. Buffer Replacement: Fairfield University shall replace the buffer of trees and shrubs that had existed before installation of University Field. To provide an effective buffer, the berm shall be doubled in width and replanted with a number of spruce trees equal to the number of white pines currently on the berm, at least 8 feet high once in the ground. In addition, lower level shrubbery shall be planted to fill in areas between trees. Each existing white pine is to stay in place, and replaced promptly when and if it dies or loses its needles. In CT Page 10129 addition, the berm shall be properly and neatly maintained by Fairfield University, sufficient for the proper growth of this vegetation.
7. No Food, Beverage, or Toilet Facilities: There shall be no food or beverage service and no toilet facilities at or within 25 yards of University Field.
8. Use of Macadam Road: The macadam surface behind the berm separating College Park Drive from University Field shall not be used for parking or for any other purpose, except for use by maintenance and emergency vehicles.
Violation of the orders set forth shall subject Fairfield University to such penalties as the court deems appropriate.
SKOLNICK, J.